No. 13,097

LUCINDA SIMPSON vs. OLIVER P. NORMAND ET ALS.

SYLLABUS.

The proof disclosing that the plaintiff and defendant had lived in open, public concubinage for more than twenty years, and a family of eleven children have been born of their illicit intercourse; and, it further appearing that this illicit intercourse was admitted by the plaintiff under oath in her answers to interrogatories on facts and articles—any claim she may make for services as house-servant and laborer are so interwoven and blended with her remuneration as a concubine, that they are, practically, indistinguishable.

When the taint exists, it affects fatally, in all its parts, the entire body of the claim.

Where there is turpitude, the law will help neither party to the transaction.

ON REHEARING.

When the interests of justice require it, a case will be remanded for further evidence.

IN RE Oliver P. Normand and Perry B. Snoddy applying for *certiorari*, or writ of review, to the Court of Appeals, Third Circuit, State of Louisiana.

*A. J. Lafargue* for P. B. Snoddy, Petitioner.

*H. C. Edwards* and *J. C. Cappel* for O. B. Normand, Petitioner

Respondent judges *pro se.*

*Joffrion & Joffrion* and *A. V. Coco* for Lucinda Simpson, Respondent.

Submitted on briefs March 11, 1899.
Opinion handed down May 1, 1899.
Rehearing granted June 12, 1899.
Opinion handed down June 12, 1899.

The opinion of the court on rehearing was delivered by MONROE, J.

The opinion of the court was delivered by

WATKINS, J. The original suit was brought against the defendant for the recovery of the sum of one thousand two hundred and eight dollars, the claim therefor having its foundation upon a recital in an authentic act of sale of a small plantation, which is situated near the town of Marksville, in the parish of Avoyelles, from the defendant to the plaintiff, which is of the following tenor, viz.:

"This sale is made for and in consideration of the price of one "thousand dollars *cash in hand* to the vendor well and truly paid, the "receipt whereof is hereby acknowledged and acquittance in full "therefor granted, being in part payment, and liquidation of *services* "*rendered* to the vendor by the purchaser *for twenty-three years as* "*house servant and laborer at eight dollars per month,* forming the "sum of two thousand two hundred and eight dollars."

That deed bears date of execution October 27, 1891.

Subsequently, the plaintiff instituted a second suit against both the defendants, Normand and Perry B. Snoddy, the object of which was to have declared null and void a certain act of sale, from Normand to Snoddy, of a certain town lot in Marksville, with the buildings and improvements thereon, on the charge of fraud and simulation—the price stipulated in the act being two thousand five hundred dollars, of which two hundred dollars was cash and the balance payable on installments, with usual and appropriate stipulations.

Upon plaintiff's motion, the two cases were consolidated and tried as one cause.

On the trial in the District Court, there was judgment in favor of the plaintiff, and that decree was affirmed by the respondents' court.

It is the last judgment and decree which the relators have brought up for our review under the provisions of Article 101 of the Constitution.

The charge of the petition in the revocatory action is that the sale complained of was a fraudulent simulation, and made through a collusion between the two defendants for the purpose of placing the property of Normand "beyond the reach and pursuit of his creditors," in violation of petitioner's rights; and the prayer of her petition is that the said sale be declared null and void, as in fraud of her rights, and that said property be subjected to the personal judgment she demands against the defendant, Normand.

The cumulated suits may be treated and considered as a revocatory action brought under the provisions of Revised Civil Code 1972—it having been brought by an individual creditor for the liquidation of her demand by a personal judgment against her debtor, and against the two parties to the alleged fraudulent contract.

Normand's answer to the first suit is, substantially, that the first act of sale or *dation en paiement* was a donation to the plaintiff under the form of a contract of sale, and that the consideration therefor is and was unreal; and, he avers, that he was not indebted to her at the time, but that he gave her the property "because he desired to give her " and her children a home, as she was his concubine, and he had lived " with her as such for many years." He averred that the sale to Snoddy was legal and valid in all respects, and neither simulated nor fraudulent, and that he had received full and adequate consideration therefor.

To this petition were annexed certain interrogatories on facts and articles which were propounded to the plaintiff.

Snoddy's answer was, in effect, that the sale to him was legal, valid, and in good faith. That he paid the cash consideration expressed in the deed, and executed the notes specified in the act of sale, took actual possession of the property immediately after his purchase and has, at all times since, exercised, and now exercises, dominion over it.

He avers that he did not know of the alleged insolvency of the vendor, if such was a fact at the time of the sale; on the contrary,

that he did not know that he was indebted to any one. That prior to his purchase, he had the notary public, who passed the act, and his attorney, to examine the record for the purpose of ascertaining whether or not the property was free of encumbrances; and that upon their assurances that there were none, he consented to and did purchase same.

He further alleges, specifically, "that the plaintiff, Lucinda Simp-" son, was the concubine of said O. P. Normand, and that she has no "real or valid claim against said Normand; and the alleged pre-" tended acknowledgement of indebtedness of said Normand to said "Lucinda Simpson, in said act of sale, of date October 27, 1891, is "fictitious, unreal, and untrue, and was done to place the property, "pretended to be conveyed to plaintiff in said act of sale, in her name "—both the parties to said pretended act of sale knowing that a donation to a concubine was prohibited by law," and that said act is a donation in disguise—and his prayer is in keeping therewith.

The plaintiff, in open court, made the following answers to the interrogatories on facts and articles, viz.:

"Interrogatory 1. What is your name, age and occupation?

"Answer. Lucinda Simpson; was born in 1842, and will be forty-six years old on the 10th of August past; and work for a living.

Interrogatory 2. With whom did you live from 1867 to 1891?

"Answer. Oliver P. Normand.

"Interrogatory 3. Have you ever been legally married; if so, to whom, and when?

"Answer. I have never been married.

"Interrogatory 4. Where is your husband, and when did you leave him?

"Answer. I have not got any; never did have any.

"Interrogatory 6. Have you any children, if so how many?

"Answer. I have eleven children.

"Interrogatory 7. Who is their father?

"Answer. O. P. Normand.

"Interrogatory 8. Were you ever legally married to their father?

"Answer. No, sir.

"Interrogatory 9. Who fed and furnished you with clothing all the years you were living with the defendant?

"Answer. I worked, to clothe myself, in the field and garden, and raised chickens.

"Interrogatory 10. Did you contract any debts during the time you were living with defendant; if so, who paid them?

"Answer. I did not contract any debts.

"Interrogatory 11. Did you work in defendant's field during the time you lived with him; if so, did you receive any share of the crop for your labor during the time, in payment for your labor?

"Answer. I worked in the field. No, sir; sometimes he would give me a little glange (scraps of cotton); two or three bales to furnish the house and buy the children clothes, and buy necessaries for the house.

"Interrogatory 12. Did the defendant ever give you any money in 1891; if you answer in the negative, please state why he acknowledged himself indebted unto you?

"Answer. Yes, sir; $2,228.00; because I labored for him; worked for him.

"Interrogatory 13. State the amount the defendant acknowledged to owe you?

"Answer. Two thousand, two hundred and twenty-eight dollars.

"Interrogatory 14. Was it not done to pass the title to you of the plantation near Marksville, on which you are living?

"Answer. No, sir.

"Interrogatory 15. Did he not tell you that he wanted to give you that place, and that a donation would not do?

"Answer. No, sir.

"Interrogatory 16. Was it not agreed and understood between you and defendant that title would be placed in your name in that property, and that he would acknowledge himself indebted to you for an amount sufficient to cover the value of the same, and that was all he was to give you?

"Answer. No, sir."

The foregoing are the interrogatories and the answers *in extenso,* and they, together with the recitals of the deed, constitute the principal part of the evidence upon which the issues were disposed of in the respondents' court.

This statement of the pleadings and evidence was necessary to be made, in order to get a proper understanding of the complaints that relators make of the opinion and decree of the respondent judges.

They are as follows, viz.:

First—That respondents erred in holding the only point on which

a "*doubt* might exist, is, as to whether the services for which pay-
" ments is claimed, had no other motive than the pre-existing con-
" cubinage of the parties, and merely incidental to such relations. To
"prove this fact, the burden of proof was clearly upon defendant."

Second—That respondents erred in holding that a concubine, "who
" admits her illicit relations, can recover from the one with whom
" she had been living in concubinage; and though the immoral rela-
" tion is a ground of defense. That she need not show that the ser-
" vices, on which she bases her claim, were rendered under an agree-
" ment, or contract, entered into *before* concubinage life began; nor
" need she show that these services were *not* incidental to that mode
" of living."

Third—That they erred in holding that the acknowledgment in the
act "of sale is proof that the debt was due for services rendered as
" laborer" by the plaintiff; and that "Normand could hardly be heard
" to say that he did not owe her the amount, as such, after having
" acknowledged it in a notarial act."

The relators complain of the aforesaid rulings as being contrary to
law, and a clear departure from the settled jurisprudence of the State,
and greatly to their prejudice, and entitle them to the remedy and
relief provided for in Article 101 of the Constitution of 1898; and
that the judgment of the respondents' court should be reviewed by
this court, and annulled and reversed, and made to conform to the
law and the jurisprudence; and a decree rendered in their favor and
in accordance therewith.

The opinions rendered by respondents upon the original hearing of
the cause, and upon the rehearing, are annexed to and made parts of
the record, and their return; and a careful examination thereof dis-
closes that their opinion and decree principally rests upon the afore-
said assumptions.

The deed upon the recital of which the suit is founded was executed
on the 27th of October, 1891; and the amount of $2,208.00, specified as
the wages due plaintiff, is equal to eight dollars per month, for a
period of twenty-three years—that is to say from 1867 to 1891.

The answers of the plaintiff to the interrogatories on facts and
articles, constitute part of the record, and they affirmatively show
that she admits having lived with Normand since that year (1867),
when she was about twenty-five years of age; and that, notwithstand-

ing they had never been married, she had borne him eleven illegitimate children.

And, according to the due course of nature, there would reasonably have been required about that number of years for the birth of that number of children; and that fact serves to confirm the theory that their life of concubinage began in 1867, when the plaintiff first commenced living with the defendant, Normand.

It is, also, an important fact that the deed contains no statement to the effect that plaintiff rendered any services to the defendant *prior* to that date; and the plaintiff, in her answers to the interrogatories on facts and articles, makes claims for no services *prior* to that date.

She claims for no such anterior services in her petition. Hence it may be accepted as an undoubted fact that no services were rendered by the plaintiff to the defendant prior to the year 1867, the date at which they began living together; and at which time, it is evident, their concubinage commenced.

At that time, and subsequently to 1891—a period of twenty-three years—the defendant was owner of the plantation which he subsequently gave to plaintiff, and of the residence in Markville which he, subsequently, sold to the defendant, Snoddy; consequently, the plaintiff went to his home to live in 1867, and there she subsequently remained, and gave birth to eleven children.

The petition is as lacking in allegation, as the record is wanting in proof, that there was any contract, agreement, or understanding, at the time she first went to the defendant's house to live, that he was to pay her eight dollars, or any other sum per month, for her services; and, if there was such an agreement, it does not stand to reason, nor accord with common experience, that a day laborer, in her circumstances, should have patiently bided the lapse of twenty-three years of time without receiving a dollar of the wages due, or even having demanded a settlement of accounts.

It is even stranger still that when the so-called settlement was made, it was carried back to 1867 as its commencement, without any computation or charge on the one side of interest arrears, during which time they had more than doubled the capital; and that on the other side, no credit had been given for amounts which she had been paid, notwithstanding she admits, in her sworn answers, that she had received several bales of cotton from defendant's crops.

As Judge Rost, speaking for the court in Oliver vs. Blancq, 2nd

86

Ann., 517, very appropriately said: "Persons in her situation are apt "to keep their cash accounts balanced; and a very strong case indeed "would have to be made out, before courts of justice would allow "claims like the present."

Taken all in all, on what other hypothesis can all of these conflict-ing theories and statements be reconciled, than that the plaintiff and defendant came together for the obvious purpose of concubinage, and that they continued in such relations to the year 1891, when the deed was executed; and afterwards?

In our opinion, there is no other that can solve the problem.

Accepting that theory, it appears quite reasonable that the defend-ant should have resorted to the subterfuge of making to his concu-bine a *dation en paiement,* in reputed compensation for services ren-dered, and by this means afforded his children a safe refuge, and secrete from the world his illicit relations with his concubine.

And such would have, doubtless, been its effect had not the plaintiff, by grasping at the shadow, endangered her hold upon the substance.

It is to the foregoing state of facts that the law must be applied.

The case on which the plaintiff's counsel and the respondents chiefly rely is Succession of Percuilhet, 23rd Ann., 294.

Opponent's claim for services as house servant and sick nurse was resisted on the ground "that, for several years *next preceding* the "death (of deceased) she lived with him as his concubine, and was so "living with him at the time of his death."

Notwithstanding "the evidence on this point did not make the "truth of the averment very clear," as the court observed, yet they announce the following to be the general principle governing such cases, viz.:

"If concubinage had been alleged and proved to have been the "motive and cause of the parties living together in the same house "*in the first instance,* and the services in question to have been "merely incidental to such a state of living, our conclusion might "have been different, but such is not the allegation, much less the "proof." (Our italics.)

Very much the same conditions are presented in Viens vs. Brickle, 8 O. S. 7, in which the court makes this statement, viz.:

"The plaintiff's own witnesses depose that she and the defendant "lived together in a greater intimacy than morality allowed. This, "however, does not seem to have been the *motive of their coming*

" *together, but the consequence of the familiarity* which a close union " of interest is apt to create between persons of different sexes."

The statement of fact upon which that opinion is predicated, makes the distinction between the case which the court had under consideration, and the instant case, very clear.

"The testimony establishes the fact," says the court, "that the " plaintiff kept a decent boarding-house for mechanics, well supplied " with furniture, *when the defendant came to board with her;* that " soon after he took the management of the house, as master of it, and " the plaintiff continued her attentions to its indoor concerns with "great care."

These facts clearly illustrate the reason for the opinion expressed, and make it evident that the motive and purpose of the·two coming together was not concubinage, but that it became incidental to the *subsequent* identity of their interests, and a consequence of the familiarity which their close intimacy thereafter produced.

But, in the case of plaintiff and Normand, the fruits of their intimacy, and the circumstances surrounding its commencement, conclusively show that concubinage was the *motive* of their coming together, and continuing together in that relation afterwards.

In Stringer vs. Mathis, 41st Ann., 985, a claim for room-rent and services as a sick-nurse was resisted, on the ground that "for many " years the plaintiff had been the concubine of the deceased,   *   *   * " and that he rented her house during the time for which remunera- " tion was claimed, solely for the purpose of concubinage."

On this state of facts being established, the court say:

"We are satisfied that the sole motive of the visits, or the occu- " pancy of the room, by Mathis   *   *   *   was the relation of concu- " binage existing between them."

The question of the illegality of contracts and obligations of different kinds, arising out of the illicit relations of parties living in concubinage together, has been frequently examined and decided by this court; and the reason and spirit of the rule announced in their opinions is founded upon the precept of the Code which declares, that "those who have lived together in open concubinage are respectively " incapable of making to each other, whether *inter vivos or mortis* " *causa,* any donations of immovables, etc." R. C. C. 1481 (1468).

We think it well to collate and restate some of those cases which

relate to that prohibition, and those ancillary thereto, as illustrating what is the established jurisprudence of this court therein.

In Succession of Beard, 14th Ann., 121, suit was brought against the estate by Mrs. Andrews on a promissory note executed by the deceased, and the defense was that she was his concubine, and that concubinage was the consideration therefor.

Notwithstanding there was nothing in the way of recital in the note to that effect, the court was of opinion, and so held, that the evidence left little doubt that an illicit intercourse subsisted between the plaintiff and the deceased; and that "evidence of this character " creates a prima facie case against the plaintiff, which throws upon " her the burden of proving a legal consideration for the instrument " sued on," and that she failed to do.

Surely a different rule should not obtain with regard to a case like the instant one, wherein suit is founded upon the mere recitals in an act which is rendered of more than questionable validity by the sworn admission of the plaintiff, in her answers to interrogatories on facts and articles, that she had lived in concubinage for a length of time sufficiently great to have borne to her paramour eleven children of their illicit connection.

Surely, if the rule established in that case is to obtain, the plaintiff, under the circumstances related, has imposed upon her the burden of proving a valid and real consideration for said sale, as well as of the recital of which she seeks to avail herself.

In Lazare vs. Jacques, 15 Ann., 599, suit was brought for the annulment of an act of sale which was made to the defendant, on the ground that she "was at the time (of its execution) his concubine, " and that it was a disguised donation."

The court held "that the deed of sale in question was a disguised " donation, and that the transfer was made for the purpose of evading " the prohibition contained in Article 1468 of the Civil Code."

Again:

"This contract being derogatory to public order, and public policy, " it is radically null and void, and, as such, it is not susceptible of " ratification or confirmation. The obligation is an illicit one; * * * it is an absolute nullity."

Now, this is an action by a self-confessed concubine of the defendant for the enforcement of an acknowledgment of indebtedness which is contained in an act of sale of exactly similar import, and is

equally as obnoxious to the law; for the enforcement of her claim necessarily carries with it the recognition of the validity of the deed to the defendant's concubine.

In Cole vs. Lucas, 2d Ann., 946, it was held that "the disabilities " under which the law places persons who have lived in a condition of " concubinage, are created for the maintenance of good morals, of " public order, and for the preservation of the best interests of "society."

In Wooton vs. Harrison, 9 Ann., 234, suit was brought on a note, the defense to which was concubinage, and of which the court said:

"We have carefully considered the evidence with regard to this "note, and the surrounding circumstances, and it has produced upon " our minds an impression so unsatisfactory, that we are not pre- " pared to say the appellant has any right to a change of the judgment " below (to one) in her favor.

"The evidence tends quite strongly to the conclusion that the rela- " tion of concubinage did once exist between the plaintiff and Har- "rison."

\*          \*          \*          \*          \*          \*          \*

"Though the existence of any lawful consideration has been put at " issue, and the showing above mentioned has been made by the " defendant, no evidence of consideration has been given by the " plaintiff."

In Delancy vs. Beale, 1 La., 488, the court said of a parallel ques- tion:

"Whenever an onerous contract is sought to be enforced by a natural " child beyond what the law authorizes the parent to grant, and con- " trary to the interest of the legitimate descendants, such contract " ought to be received with suspicion; and the presumption fairly " arises that it was made for the purpose of disguising an illegal " donation.

"*The presumption once admitted, throws the burden of proof on* " *the plaintiff to establish the genuineness of the contract.*"

The foregoing principles have always found recognition in the decisions of this court, and it has never failed to emphasize and enforce them in the most rigorous and decided manner.

Illustrations are found in the following cases:

In Davis vs. Holbrook, 1st Ann., 176, is found a report which has always been conspicuous in our judicial history, and therein the gen-

eral rule applicable to this class of cases is very forcibly stated thus:

"A contract must have a *lawful purpose;* and if it have an *unlawful* " *cause*—if it be contrary to good morals, *or public order*—it can " have no effect."

"A party will not be heard who asks the court to relieve him from " the consequences of having violated the law."

In Association vs. Berghaus, 13th Ann., 209, the same precept is thus announced, viz.:

"When a contract belongs to a class which is reprobated by public " policy, it will be declared void, although in that particular instance, " no injury to the public may have resulted.

"The case must yield to the principle, and not the principle to the " case."   Fox vs. City, 12th Ann., 154; Glover vs. Taylor, 38th Ann., 634.

A similar opinion was expressed by the Supreme Court in Bartle vs. Coleman, 4 Peters, 186:

"When," say the court, "the contract grows immediately out of, or " is connected with, an illegal or immoral act, a court of justice will " not lend its aid to enforce it; and, if the contract be in fact only " connected with the illegal transaction, and growing immediately " out of it, though it be in fact a *new contract,* it is equally tainted by " it."

In Trist vs. Child, 21 Wallace, 441, this idea was thus forcibly expressed, while recognizing the validity of an honest claim for services honestly rendered, viz.:

"But they are blended and confused with those which are forbid- " den; the whole is a unit, and indivisible.

"That which is bad, destroys that which is good, and they perish " together.   *   *   *   Where the taint exists, it affects fatally, in all " its parts, the entire body of the contract.

"In all such cases *potior conditio defendentis.*

"*Where there is turpitude, the law will help neither party.*"

To the same effect are many other cases.

Marshall vs. Railroad Co., 16 Howard, 314; Tool Company vs. Morris, 2 Wallace, 45; Cappel vs. Hall, 7 Wallace, 542; Meguire vs. Corwine, 101 U. S., 108.

But, it is needless to burthen this report by the citation of additional authorities when they are practically in accord upon the foregoing propositions.

Conceding all that plaintiff claims, and considering all she admits under oath, the value which is placed upon her services as house-servant and laborer of the defendant, are so completely combined with those in remuneration for her illicit co-habitation with Normand as concubine, as to be completely indistinguishable, one from the other; and the taint existing, it fatally affects plaintiff's entire demand, in all its parts, and renders it wholly and entirely void.

For the enforcement of a contract thus circumstanced, she has neither remedy nor redress in a court of justice.

In our opinion, the decree of the respondents' court is at variance with the well-settled principles of law, and the uniform jurisprudence of this court, as we have fully detailed and set forth; and in the exercise of the power and duty conferred upon this court by Article 101 of the Constitution, we feel constrained to reverse and annul their judgment and decree, and to render a judgment in favor of the defendant, Normand, and against the plaintiff, rejecting her demands *in toto*—to the end that the uniformity of jurisprudence may be preserved throughout the State in the courts thereof.

J. O. Toole vs. C. H. Minge & Co. *In re* A. J. Ingersoll, applying for writ of error to the Court of Appeals, First Circuit, 50th Ann., 748.

Goldman & Masur vs. L. H. Goldman. *In re* Goldman & Masur applying for *certiorari* or writ of review to the Court of Appeals, Second Circuit, State of Louisiana. 51st Ann., 761.

The Brown Shoe Co. vs. J. N. Hill & Bro., *et al. In re* the Brown Shoe Company, applying for *certiorari* or writ of review to the Court of Appeals, Second Circuit, State of Louisiana. 51st Ann., 920.

L. D. McLain *et alii* vs. N. Burgess. *In re* L. D. McLain *et alli,* praying for a writ of error to the judges of the Court of Appeals, First Circuit, State of Louisiana. 50th Ann., 999.

It is therefore ordered and decreed that the judgment and decree which was rendered by the respondents, and, likewise, the judgment of the District Court which it affirms, be and the same are annulled and reversed; and it is further ordered and decreed that the demands of the plaintiff be rejected and disallowed at her cost in both courts.

## ON REHEARING.

MONROE, J. In view of the fact that there is no evidence in the re-

cord which bears distinctly upon the motive which brought the plaintiff, Lucinda Simpson, and the defendant, Normand, together originally, and we are induced to believe from the representations made by plaintiff's counsel in their application for rehearing that such evidence, not introduced upon the trial because believed to be unnecessary, is nevertheless obtainable, we have concluded that the interests of justice will be best subserved by remanding the case for further evidence, rather than by rejecting the plaintiff's demand.

It is therefore ordered and adjudged that our former decree herein be set aside, and it is now ordered, adjudged and decreed that the judgment and decree rendered by respondents, as also the judgment of the District Court which it affirms, be and the same are hereby annulled, and it is further ordered, adjudged and decreed, that the respondents remand the case of Lucinda Simpson vs. Oliver P. Normand et als. to the District Court from which it was appealed, to be there proceeded with according to law.

It is further ordered that the costs of this proceeding and of the appeal to the Circuit Court, be paid by said Lucinda Simpson, and that the costs of the District Court await the final determination of the case.